**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**ANTHONY BOOTH and JERRY BROWN,**

     **Plaintiffs,**

**v.**                    **CASE NO:  8:09-CV-02621-T-30TBM**

**PASCO COUNTY, FLORIDA and**
**INTERNATIONAL ASSOCIATION OF**
**FIREFIGHTERS LOCAL 4420, d/b/a Pasco**
**County Professional Firefighters**

     **Defendants.**
_____/

## ORDER

THIS CAUSE comes before the Court upon Defendant Pasco County Professional

Firefighters, Local 4420, IAFF's Motion to Dismiss Amended Complaint and Supporting

Memorandum of Law (Dkt. #37), Plaintiffs' Opposition to Defendant Pasco County

Professional Firefighters, Local 4420, IAFF's Motion to Dismiss Amended Complaint and

Supporting Memorandum of Law (Dkt. #42), Defendant Pasco County, Florida's Motion to

Dismiss Counts I, III, IV, and VI of Plaintiff Anthony Booth's Amended Complaint and

Memorandum of Law in Support (Dkt. #38), Plaintiff's Opposition to Defendant Pasco

County, Florida's Motion to Dismiss Counts I, III, IV & VI of Plaintiff Anthony Booth's

Amended Complaint and Supporting Memorandum of Law (Dkt. #43), Defendant Pasco

County, Florida's Motion to Dismiss Counts VII, VIII, XVIII, XXIII of Plaintiffs' Amended

Complaint and Memorandum of Law in Support (Dkt. #39), and Plaintiffs' Memorandum of Law in Opposition to Defendant Pasco County, Florida's Motion to Dismiss Counts VII, VIII, XVIII and XXIII (Dkt. #41). The Court, having considered the motion, response, memoranda, and being otherwise advised, finds that the motions to dismiss should be denied in part, and granted in part.

## BACKGROUND

Plaintiff Anthony Booth (hereafter referred to as "Plaintiff Booth" or "Booth") is Hispanic, and his national origin is Venezuelan-Spaniard. He began working for Pasco County (hereafter referred to as "Pasco", "the County", or "Pasco County") as a Firefighter/EMT in August of 2003. Jerry Brown ("Plaintiff Brown" or "Brown") began working for Pasco County as a Driver/Engineer in January of 1997. Brown's wife's family is Jewish. Both Brown and Booth ("Plaintiffs" collectively) became dues-paying members of the International Association of Firefighters Local 4420 (hereafter referred to as "the Union") in 2005, when the Union first organized.

Captain Mark Bodden ("Bodden" or "the Captain"), Booth's supervisor at Station 14, harassed Booth frequently and behaved inappropriately towards him. Bodden yelled at Booth, and shouted profane words at him many times while other co-workers or citizens were present. Additionally, Bodden made racial comments in the presence of others so that Booth could overhear. Bodden called Booth a "beaner," a pejorative term for Hispanics and Latinos, and made derogatory remarks about "beaners" in general. When Booth told Bodden and others that he was going to Venezuela to visit his family, the Captain allegedly remarked that

Booth was stupid for going to "a country like that."

In May of 2007, Booth went on an emergency call with his crew. The patient was a child, whose mother did not speak English. The patient's mother asked if anyone in the crew spoke Spanish, to which the crew responded in the negative. Firefighter/Paramedic Stacie Quisenberry ("Quisenberry") allegedly said, "We are not in Mexico," at which Bodden laughed. He did not discipline Quisenberry for the comment.

After returning from the call, Plaintiffs complained to Bodden about Quisenberry's insensitive remark. Booth reminded the Captain that he was Hispanic, and took offense to Quisenberry's comment. The Captain refused to reprimand Quisenberry, and dismissed the comment as being due to her having "a bad day."

In June of 2007, Brown was "riding up" as Captain. Booth told Brown that he was going to get lunch, but Booth did not tell Bodden he was leaving because several times prior, Bodden said that when Brown was riding up, Brown was in charge, thus implying that Bodden's permission was unnecessary. While Booth was getting lunch at Publix, Bodden approached Booth, got within inches of his face in front of co-workers, Publix employees, and other citizens, and berated him for parking so close to Publix. Bodden also said that Booth had left without finishing his duties and attending the morning meeting. However, there was no meeting that morning, and management had told Booth to leave his mopping duties unfinished due to the weather. During the incident, Booth repeatedly asked Bodden to address this issue back at the station, and that Publix was not an appropriate venue to discuss this.

The same day as the episode in Publix, Bodden made a racial comment about loving a T-shirt that said "100% cotton and your mamma picked it," which Booth found highly offensive.

On June 2, 2007, Booth realized that his truck was out of needle-less hubs, and asked the hospital at which he had arrived on a call if he could have a few hubs to hold the truck over until the unit returned to the station. When Bodden saw Booth using the hubs at the station, he accused Booth of stealing them from the hospital, despite Booth's numerous attempts to explain otherwise. Bodden did not accuse Booth's Caucasian partner of theft, who was present when the hospital gave the hubs to Booth.

On June 11, 2007, as Booth was finishing his overtime shift, Bodden harassed Booth about not being in uniform when he was checking his truck, even though the Captain did not require a Caucasian firefighter present to be in uniform. Bodden himself was not in uniform when he demanded that Booth be in uniform.

Later during that shift, Bodden told Booth to take an EMT refresher test. When Booth told the Captain he had already finished the test the prior evening, Bodden accused Booth of cheating on the exam. After that incident, Bodden required Booth to complete all tests in his presence, while Caucasian employees were not subject to similar restrictions.

After the refresher-test incident, Bodden told Driver/Engineer Knarich that Booth was not on an engine because he was being disciplined, even though the Captain never made Booth aware that he was being disciplined, much less for what he was being disciplined.

During the same shift, Bodden tried to make Booth sign a written reprimand for the needle-less hub incident, even though Booth had already been verbally reprimanded for the same activity. Booth refused to sign it, and requested union representation. Bodden became enraged, and told Booth to "get out of the office."

Bodden contacted Battalion Chief ("BC") John Himmel ("Himmel") and told him that Booth refused to sign the written reprimand. BC Himmel contacted Booth and demanded that he follow his superiors' orders, requiring Booth to sign the written reprimand.

On June 14, 2007, Booth filed a grievance alleging discrimination, hostile work environment and harassment to Pasco County, as a result of Bodden's behavior. Booth identified Brown as a witness to the Captain's discriminatory treatment. Shortly after filing the grievance, Booth was transferred to Station 11 by BC Himmel.

The next day, Battalion Chief ("BC") James Ciccarello (Ciccarello) and BC Himmel met to discuss Booth's complaint. They decided that Booth had a legitimate complaint against Bodden. BC Ciccarello told BC Himmel to speak with Bodden about the discriminatory treatment.

BC Himmel met with Booth on June 17, 2007, to discuss his complaints and apologized for Captain Bodden's behavior. Booth asked to be returned to Station 14 so he would not lose his bid assignment. BC Himmel told Booth it was best to "move on" to advance his career, indicating that it would be best to forget the incident.

On the same day, BC Himmel allegedly met with Bodden to discuss his behavior and told him that a hostile work environment would not be tolerated. However, Pasco did not

discipline Bodden at the time.

A few days after Booth filed his grievance complaining about discrimination, Bodden reported Quisenberry's racial comment from May of 2007 to BC Himmel, which resulted in a verbal counseling to Quisenberry on June 20, 2007. Around the same time, Pasco denied Booth's grievance. BC Ciccarello allegedly instructed BC Himmel to deny the grievance and indicated that he would do the same if it was elevated to Step 2.

Around June 23, 2007, Booth elevated his grievance to Step 2. A few days later, Acting Assistant Chief James Ciccarello told Booth that his allegations were being investigated.

Around June 29, 2007, Pasco conducted a fact-finding hearing with Bodden and BC Himmel regarding Booth's allegations. Bodden admitted that his behavior was inappropriate, but said that Booth was difficult to work with as he did not follow orders and was belligerent. Booths' personnel files did not have records of any such performance issues.

Booth argues that despite his complaints, the hostile work environment and discrimination continued, and that after he named Brown as a witness to the discriminatory events, Brown started to experience a retaliatory and hostile working environment. For example, Bodden made several anti-Semitic comments in the presence of Brown, knowing that Brown's wife is Jewish. Brown told the Captain frequently that he found his comments offensive.

On July 5, 2007, Bodden told Brown that Station 14 was being called "Stalag 14" now. "Stalag" is a German prison camp for noncommissioned officers or enlisted men. When Brown confronted the Captain over his "Stalag" comment, the Captain told Brown that he saw Brown's

name on Booth's complaint. Bodden accused Brown of being out to get him.

The next day, Bodden told Acting BC II Rick Caranova that he had gotten rid of Booth, referring to Booth's transfer to Station 11, and that Driver/Engineer Miller and Brown were next. Acting BC II Caranova told Brown about Captain Bodden's threat to get rid of him.

Consequently, Brown filed grievances with Pasco against Captain Bodden for his anti-Semitic comments, for creating a hostile work environment, and the Captain's comments about transferring Brown. Brown tried to get the Union to help him file his grievance with Pasco County, but the Union refused to help him.

On July 20, 2007, Booth elevated his discrimination and harassment grievance to Step 3 after no resolution from Pasco County or the Union.

Bodden became a dues-paying member of the Union in August of 2007, allegedly after Captain/Engineer Darren Pasquino advised Captain Bodden to join the Union so that Booth could not try to get him for "union busting."

On August 10, 2007, Emergency Services Director Anthony Lopinto received Booth's Step 3 grievance and told Booth that the issues were still being investigated and that there was a delay in the disciplinary hearing for Bodden so that he could get union representation, and because of Bodden's investigation.

Later that month, BC Himmel lowered Booth's ratings from "5" to "4" in his ability to get along with others and his co-workers on his performance evaluation. Prior to Booth's complaints, Pasco County never rated him a "4" in this area.

On August 31, 2007, Pasco gave Captain Bodden notice of a September 12, 2007 administrative hearing on Booth's complaints. However, the hearing was delayed. Pasco County did not do a fact-finding on Booth's grievances until November of 2007. During Pasco County's investigation of Plaintiffs' discrimination complaints, it only interviewed Bodden's current co-workers at other stations, and/or employees that did not work at Station 14 on a regular basis.

On November 5, 2007, Pasco found Bodden's behavior to be in violation of the County's policies and indicated that it would take disciplinary action against Captain Bodden. Three days after Bodden's disciplinary hearing became public, Plaintiffs' shift assignments were changed once again. Specifically, Booth was transferred to a rescue assignment, which is considered punishment within the fire department.

On November 20, 2007, Brown filed another grievance against Pasco for continued discrimination and retaliation when he was transferred. Consequently, Pasco told Brown that his grievance was not grievable because the administration had the right to assign personnel as needed, and that the transfers were not retaliation.

On December 30, 2007, Brown tried to get someone to cover his overtime shift because he had a toothache, but to no avail. Captain Darrel Ryals excused him from the overnight shift due to his illness. On January 10, 2008, Pasco wrote Brown up for not working his overtime shift on December 30, 2007, despite the fact that Brown had been excused from it. Pasco did not write up another Captain for not working his overtime shift when his wife was ill.

In March of 2008, Brown's sister died. He requested vacation time for March 28, 2008 from BC Himmel after he learned that vacation slots on that date had become available. BC Himmel denied Brown's request, saying that all available vacation slots for that day were filled. Brown later learned that BC Himmel granted Firefighter/EMT Justin Behnke vacation time for March 28, 2008. Behnke was less senior to Brown and had not similarly engaged in protected activity.

On April 11, 2008, Booth filed "Booth Charge 1" against Pasco, alleging race and national origin discrimination and retaliation for the discriminatory comments, unwarranted discipline, hostile working environment, retaliatory transfer and continued discrimination and retaliation. On the same day, Booth filed "Booth Charge 2" against the Union, alleging race and national origin discrimination for favoring Bodden over Booth in regards to Booth's complaints of discrimination, harassment and hostile working environment.

On April 11, 2008, Brown filed "Brown Charge 1" against Pasco County alleging religious discrimination and retaliation for the discriminatory comments, unwarranted discipline, retaliatory transfer and continued retaliation. On the same day, Brown filed "Brown Charge 2" against the Union, alleging religious discrimination for the Union treating Bodden more favorably than Brown with regard to Brown's complaints of discrimination.

In April of 2008, the Union distributed a memo to fire stations around the County including a reference to Plaintiffs' complaints. Plaintiffs allege they experienced harassment by their co-workers in retaliation for filing complaints with the Equal Employment Opportunity Commission (EEOC).

Brown reported certain co-worker's harassment to BC Himmel, but neither he nor Pasco County took any action. BC Himmel also lowered Brown's rating from a five to a four in his ability to get along with others and his co-workers on his performance evaluation. Prior to filing the complaint, Brown had never received a four.

In October of 2008, Booth filed Booth Charges 3 and 4 against Pasco County and the Union for retaliation when the County and Union posted the legal issue update memo, and for the harassment that ensued. In the same month, Brown filed Brown Charges 3 and 4, respectively, against Pasco and the Union for retaliation when the legal update memo was posted, and the harassment that resulted.

In early 2008, Pasco passed over Booth for promotion. He was eighth on a list of driver/engineers, and the County promoted only six individuals. Pasco allegedly unequivocally told Booth and Brown that they would not be promoted in the future.

Plaintiffs argue that Pasco retaliated by creating a hostile work environment, and by disciplining, transferring, and giving lower performance ratings to Plaintiffs, and that these actions are causally connected to Plaintiffs' complaints about the discriminatory practice and retaliatory treatment, and their EEOC and FCHR filings. Additionally, Plaintiffs argue that the Union's retaliatory actions against Plaintiffs are a result of Plaintiffs' complaints about, objections to and opposition of the discriminatory and retaliatory treatment and to their EEOC and/or FCHR filings. Plaintiffs argue the Union behaved willfully and maliciously, and such behavior warrants an award of exemplary damages to punish the Union and to deter them and others from behaving this way again.

Plaintiffs also argue that as a result of the foregoing actions, they have suffered lost wages and benefits, loss of enjoyment of life, humiliation, mental anguish and emotional distress, and will continue to suffer these damages in the future. Additionally, Plaintiffs had to retain attorneys to whom they are obligated to pay fees, costs, and expenses.

## STANDARD OF REVIEW

Determining the propriety of granting a motion to dismiss requires courts to accept all the factual allegations in the complaint as true and evaluate all inferences derived from those facts in the light most favorable to the plaintiff. *See Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1483 (11th Cir. 1994). Nonetheless, "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003). To survive a motion to dismiss, a plaintiff's complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955. While in the ordinary case a plaintiff may find the bar exceedingly low to plead only more than "a statement of facts that merely creates a suspicion [of] a legally cognizable right of action," it is clear that "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. *Id.* At 1959, 1965; *see also Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 974, n.43 (11th Cir. 2008) (noting the abrogation of the "no set of facts" standard and holding *Twombly* as a further articulation of the standard by which to evaluate the sufficiency of all claims"). Absent the necessary factual allegations, "unadorned,

the-defendant-unlawfully-harmed-me accusation[s]" will not suffice. *Ashcroft v. Iqbal*, 129

S.Ct. 1937, 1949 (2009).

## DISCUSSION

Title 42 U.S.C. § 1981, in pertinent part, says:

(a) Statement of equal rights
    All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined
    For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) Protection against impairment
    The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

Title 42 U.S.C. §1983, in pertinent part, says:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

Title VII of the Civil Rights Act of 1964 (codified as Title 42 U.S.C. §2000e) prohibits discrimination by covered employers on the basis of race, color, religion, sex or national origin.

The essential elements of a §1981 employment discrimination claim are the same as a Title VII employment discrimination claim. *See Bass v. Bd. of County Comm'rs*, 256 F. 3d 1095, 1109 (11th Cir. 2001) (noting that elements of race discrimination claim under Section 1981 are the same as Title VII disparate treatment claim in employment context); *McNeal v. Tarrant*, 2009 WL 1132348, Case No. 08-14250 (11th Cir. April 28, 2009) (noting Section 1981 has the "same requirements of proof and uses the same analytical framework as Title VII"). In the absence of direct evidence of racial discrimination, a plaintiff would assert a prima facie case of racial discrimination by alleging the elements of the *McDonnell Douglas* framework, i.e. that: "(1) he is a member of a protected class; (2) he was subjected to an adverse employment action; (3) his employer treated similarly situated employees who are not members of the plaintiff's class more favorably; and (4) he was qualified for the job or job benefit at issue." *Rice-Lamar v. City of Fort Lauderdale*, 232 F.3d 836, 842-843 (11th Cir. 2000).

However, the *McDonnell Douglas* framework is an evidentiary standard, not a pleading requirement. *See Swierkiewicz v. Sorema, N.A.* 534 U.S. 506, 514 (2002); *Twombly*, 550 U.S. at 569-570 (noting that the Court's holding does not run counter to *Swierkiewicz*, which held that "a complaint in an employment discrimination lawsuit [need] not contain specific facts establishing a prima facie case of discrimination"). Thus, "a Title VII complaint need not allege facts sufficient to make out a classic *McDonnell Douglas* prima facie case," but must "provide 'enough factual matter (taken as true) to *suggest*' intentional race discrimination." *Davis v. Coca-Cola Bottling Co.*, 516 F.3d 955, 974 (11th Cir. 2008) (emphasis added) (dismissing some of plaintiffs' claims where plaintiffs presented no facts to support complaint's statement that

plaintiffs were denied promotions and treated differently because of race).

<u>The Union's Motion to Dismiss Counts II, V, X, and XIII (Booth)</u>

The Union argues that there are no factual allegations to establish that Local 4420 intentionally discriminated against Plaintiff Booth because of his race or national origin by not helping in his grievance, or that any of its agents knew about Plaintiff Booth's race or national origin, or the contents of his grievance. The Union also argues that there are no factual allegations that the station's actions adversely affected Plaintiff Booth.

To begin with, the Union is not alleging that the *McDonnell Douglas* framework needs to be met in the instant case, as Plaintiff Booth seems to believe. As discussed earlier, "a Title VII complaint need not allege facts sufficient to make out a classic *McDonnell Douglas* prima facie case," but must "provide 'enough factual matter (taken as true) to *suggest* intentional race discrimination." *Davis*, 516 F.3d at 974 (emphasis added) (dismissing some of plaintiffs' claims where plaintiffs presented no facts to support complaint's statement that plaintiffs were denied promotions and treated differently because of race).

Taking Booth's allegations as true, there is insufficient evidence of discrimination or disparate treatment by the Union. Although the Amended Complaint sets forth facts that the Union did not assist Booth with his grievance, there are no allegations to establish that this failure was *based on* Booth's race or national origin.

Moreover, there are insufficient allegations to establish an adverse action. As the Union points out in its motion, it is not Booth's employer and it is not responsible for any alleged adverse actions such as discipline, failure to promote, or transfers by Pasco. It is also unclear in

the Amended Complaint how Booth was adversely affected by the Union's alleged failure to assist with his grievance.

Accordingly, the Union's motion on these grounds is granted, and Counts II, V, X, and XIII of Plaintiffs' Amended Complaint are dismissed without prejudice.

## The Union's Motion to Dismiss Counts XVI, XXI, XIX and XXIV

The Union argues that Plaintiffs' charges of retaliation stem from the legal update memo that was distributed to Pasco fire stations. The Union argues that it had a responsibility to apprise its members of its legal situation. The Union also argues that it cannot be held liable for what its members say and do, insisting that the harassment that Plaintiffs faced from coworkers is neither its responsibility, nor its liability.

Plaintiffs and the Union cite the same test for stating a claim for retaliation under the FCRA and Title VII. A plaintiff must demonstrate that: (1) he engaged in protected activity; (2) he suffered an adverse action; and (3) that a causal connection exists between the protected activity and the adverse action suffered. *Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008).

In regards to the first prong of the test, Plaintiffs allege facts in their Amended Complaint that they filed charges of discrimination and retaliation against the Union with the EEOC and FCHR. Filing such charges are a protected activity, thus meeting the requirements of the first part of the test.

In regards to the second prong of the test, Plaintiffs allege enough facts to support that they plausibly suffered an adverse action, the retaliation, which they allege to be the posting of the legal update memo, which invited retaliation from other members of the Union. Moreover, they

put forth enough facts to support that they plausibly suffered the adverse action because of their protected activity. For example, Plaintiffs were retaliated against shortly after filing the EEOC charges, when the Union distributed their legal update memo, which characterized their claims as "frivolous." Moreover, Plaintiffs were specifically identified in the memo as having filed the complaints. This allegedly resulted in harassment from coworkers, including the refusal to swap shifts, the placement of a sticker titled "Department Asshole" on Brown's locker, and a comment from another firefighter that "Someone needs to shut his f—ing mouth, before our dues go up," referring to union members having to pay higher dues because of Brown and Booth's protected activity.

Accordingly, the Union's motion on these grounds is denied, and Counts XVI, XXI, XIX and XXIV of Plaintiffs' Amended Complaint are not dismissed.

<u>Pasco County's Motion to Dismiss Counts I, III, IV, and VI and the</u>

<u>Union's Motion to Dismiss Counts II & V</u>

The Union and Pasco both argue that Plaintiff Booth's discrimination claims are barred because he only checked "national origin" on his EEOC complaint, and failed to check "race." Defendants insist that failing to check "race," and then alleging race discrimination on the Amended Complaint, render the claims invalid.

Plaintiff Booth did not fail to exhaust his administrative remedies by failing to check "race" on his complaint. The Union and Pasco rely on *Graham v. Wal-Mart Stores, Inc.* for the proposition that "national origin" does not equal "race", and hence claiming race discrimination after only checking "national origin" is inappropriate. The plaintiff in *Graham* alleged national

origin discrimination in his complaint even though the Charge of Discrimination was based on race. *Graham v. Wal-Mart Stores, Inc.*, 2006 U.S. Dist. LEXIS 7821 (M.D. Fla. 2006).

However, in *Graham*, the plaintiff only used the term "black" and "white," while the terms at issue in the instant case are "Venezuelan-Spaniard" and "Hispanic." *Graham*, 2006 U.S. Dist. LEXIS at 2. In fact, the *Graham* Court conceded that if the plaintiff had described himself as "African-American" instead of "black," it may not have dismissed his claims. *Id.* at 3. Plaintiff Booth is not arguing that "Hispanic," which arguably many people equate with "black" and "white" as racial terms, constitutes national origin discrimination. Rather, he argues that "Hispanic" can refer to national origin from which racial discrimination can stem.

Pasco argues that claims of discrimination based on national origin are not the same as claims of race or color discrimination. *Ang v. Procter & Gamble, Co.*, 932 F.2d 540, 546 (6th Cir. 1991) (dismissing color discrimination claim not enumerated in Charge because it is not reasonably expected to grow out of national origin claim and plaintiff did not exhaust his administrative remedies). Plaintiff Booth rightfully points out that Ang's color discrimination claim was dropped because, among other things, Ang had counsel's assistance in filing his claim. The *Ang* Court indicated that the plaintiff's failure to compartmentalize the claims was not sufficient to warrant dismissing the race-discrimination claim. In fact, the court stated that because Ang's Asian race and Indonesian ancestry were closely related and may have both contributed to any discrimination he suffered, the lower court could have concluded that an investigation could reasonably include discrimination based on race and national origin.

Pasco also cites *Oranika v. City of Chicago* to argue that "national origin" does not necessarily mean "race." *Oranika v. City of Chicago*, 2005 WL 2663562 (N.D. Ill. 2005). However, *Oranika* goes on to say that, *". . . a particular national origin can be reasonably understood to indicate a particular race or color in some instances, such as where the populace of that nation is overwhelmingly of a single race or color." Oranika v. City of Chicago*, 2005 WL 2663562 (N.D. Ill. 2005) (citing *St. Francis College v. Al-Khazraji*, 481 U.S. 604, 61, 95 L.Ed. 2d 582, 107 S.Ct. 2022 (1987)). Additionally, Florida courts have recognized that national origin and race are in many cases "indistinguishable." *Henry v. University of South Florida Board of Trustees*, 2009 U.S. Dist. LEXIS 115227 (M.D. Fla. 2009).

Going beyond the distinction between "race" and "national origin" generally, the Union and Pasco argue that "Hispanic" is not a racial classification, and thus Plaintiff Booth's race claims should be thrown out. However, "Hispanic" is often understood to refer to someone's race. *Alonzo v. Chase Manhattan Bank*, 25 F. Supp. 2d 455 (S.D. N.Y. 1998). The plaintiff in *Alonzo* only used the term "Hispanic" in his EEOC charge, and the court refused to dismiss his complaint and held that the charge of discrimination encompassed both race and national origin claims. *Id.* at 460. The court determined that the terms "Hispanic" and "Hispanic origin" could encompass claims for both race and national origin discrimination. *Id.* at 459. The common use of the term "Hispanic" has blurred the line between race and national origin discrimination. *Salas v. Wisconsin Dept. Of Corr.* 493 F.3d 913 (7th Cir. 2007).

Plaintiff Booth used the term "Hispanic background" in his claim. The term "Hispanic background" encompasses both race and national origin discrimination claims. Furthermore,

where claims are based on identical facts, just as they are in Plaintiff Booth's Complaint, the claims are related. *Grey v. City of Norwalk Bd. Of Education*, 304 F. Supp. 2d 314, 323 (D.Conn. 2004).

Moreover, Plaintiff Booth filled out his EEOC complaint without the benefit of counsel, which is grounds for the court to apply a less exacting standard to the charges filed by individuals. *Buckner v. Computer Sciences Raytheon*, 1992 U.S. Dist. Lexis 22664 (M.D. Fla. 1992) (recognizing that EEOC charges are frequently filed without the benefit of counsel and therefore the standards should be liberally applied). Additionally, the EEOC Compliance Manual recognizes that "national origin and race often overlap because persons who themselves are, or whose ancestors were, of the same national origin frequently are of the same race." EEOC Compliance Manual 915.003 § 15.

Therefore, Counts I, II, III, IV, V and VI of Plaintiff Booth's Amended Complaint and Supporting Memorandum of Law rely on a theory of race and national origin supported by federal and state case law. Plaintiff Booth's claims of race discrimination should not be invalidated due to a procedural technicality. *Sanchez v. Standard Brancs, Inc.*, 431 F.2d 455, 465-66 (5th Cir. 1970).

Accordingly, the Union and Pasco's motions on these grounds are denied, and Counts I, II, III, IV, V and VI of Plaintiffs' Amended Complaint are not dismissed for failure to exhaust an administrative remedy.

<u>Pasco County's Motion to Dismiss Counts VII, VIII, XVIII, and XXIII</u>

Pasco argues that Plaintiffs' §1981 claims fail to state a claim for relief that is plausible on its face, and lays out four reasons: (1) Plaintiff Booth and Plaintiff Brown failed to identify an official policy or custom sufficient to plead a plausible claim for relief under §1981/1983; (2) Plaintiffs' Amended Complaint does not identify a final policymaker sufficient to plead a plausible claim for relief under §1981/1983; (3) Plaintiffs' Amended Complaint fails to allege ratification sufficient to plead a plausible claim for relief under §1981/1983; and (4) Plaintiffs' Amended Complaint's *respondeat superior* theory fails as a matter of law. If any of these requirements is not met, then the §1981 claims fail to state a claim.

First, Plaintiffs did not sufficiently identify an official policy or custom sufficient to plead a plausible claim for relief under §1981/1983. Pasco is right that claims filed against governmental entities under §1983 for §1981 violations have to allege that the violations stem from a "custom or policy" of that body. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 708 (1989).

The Eleventh Circuit held that a policy or custom is established by assertions of discrimination on the grounds that "a long standing and widespread practice is deemed authorized by the policymaking officials because they must have known about it but failed to stop it." *Brown v. City of Ft. Lauderdale*, 923 F.2d 1474 (11th Cir. 1991).

Plaintiff Booth suffered from discriminatory harassment and retaliations from Captain Bodden over a period of several years, and Plaintiff Brown was discriminated against and harassed after being named a witness in Plaintiff Booth's June 2007 grievance. Moreover, Pasco

delayed the fact-finding hearing to assess the merits of Plaintiffs' claims, and then in a separate incident, wrote up Plaintiff Booth for missing a shift that his supervisor had allowed him to skip.

However, the Eleventh Circuit's use of the word "widespread" is dispositive of whether the discrimination faced by Plaintiffs was actually a policy or custom. Plaintiffs do not allege that such discrimination occurred across the County, or that it even occurred against anyone in the station but the two of them. Plaintiffs' allegations do not necessarily indicate a "widespread" practice. Because failure to plead a policy or custom is a necessary element of a §1981 claim, these claims should be dismissed without prejudice with leave for Plaintiffs to amend.

Second, Pasco alleges that Plaintiffs' §1981 claims are deficient because they fail to identify a final policymaker. Pasco cites *Rosario v. Miami-Dade County* for the proposition that a county's final policymaking authority rests with its Board of Commissioners, and that §1983 municipal liability is barred for actions of subordinate officials whose actions are reviewable by the final policymaking authority. *Rosario v. Miami-Dade County*, 490 F. Supp. 2d 1213, 1222 (S.D. Fla. 2007). Pasco also points to *Manor Healthcare Corp v. Lomelo* to support its argument. However, both cases cite the Miami and Sunrise city charters, respectively, as the source for the Boards' review power over county service employees. As Plaintiffs point out, there is no such article in the city ordinance in the instant case.

Pasco does not have the explicit final policymaking authority regarding action taken against employees of the Emergency Services Department, and Pasco does not point to any specific ordinance that indicates otherwise. The ordinance that Pasco cites discusses rule promulgation and approval, but does not discuss the review of decisions made by county

employees.  In regards to whether Director Lopinto and BC Ciccarello have final policymaking authority as Plaintiffs allege, at this stage, the Court must assume that the facts alleged in Plaintiff's Amended Complaint are true.  Defendant's argument to the contrary is more appropriate for a motion for Summary Judgment.

Third, Pasco alleges that Plaintiffs' Amended Complaint fails to allege proper ratification to plead a plausible claim for relief under §1981 and §1983.  Ratification can be demonstrated by showing that ". . . local government policymakers had an opportunity to review the subordinate's decision and agreed with both the decision and the decision's basis." *Garvie v. City of Ft. Walton Beach, Fla.*, 366 F.3d 1186, 1189 (11th Cir. 2004).  Pasco argues that since Plaintiffs did not identify the correct final policymaker, they did not demonstrate ratification adequate for a successful claim under §1981 and §1983.

The issue of whether there was adequate ratification by the final policymaking authority is also an issue more appropriately addressed in a Motion for Summary Judgment, because it turns on who is the final policymaking authority.

Fourth, Pasco argues that Plaintiffs' reliance on *respondeat superior* as an alternative theory of Pasco's liability is unfounded, since a county's liability under §1983 cannot be rooted in *respondeat superior*.  *Monell v. Dept. of Social Servs.*, 436 U.S. 658, 694 (1978).  *Respondeat superior* holds employers liable for the actions of their employees done within the course of their employment.  Plaintiffs agree with Pasco that *respondeat superior* is not directly applicable to the instant case, but points out that the Eleventh Circuit has held that a plaintiff may prove a policy for §1983 purposes by showing that the failure to supervise or train evidenced a "deliberate

indifference" to the rights of others. *Gold v. City of Miami*, 151 F.3d 1346 (11th Cir. 1998).

However, as set forth herein, Plaintiffs fail to allege sufficient facts demonstrating a deliberate or widespread indifference to amount to a policy for §1983 purposes. Plaintiffs do not cite any instances of discriminatory treatment by other Captains or superiors that were the result of inadequate training, or that would have warranted the County to institute training in response.

Accordingly, Pasco County's motion on these grounds is granted to the extent that Plaintiffs failed to adequately allege an official County policy of discrimination and the County's employee training as being inadequate, and Counts VII, VIII, XVIII, and XXIII of Plaintiffs' Amended Complaint are dismissed without prejudice to Plaintiffs to amend within 20 days.

It is therefore ORDERED and ADJUDGED:

1.      Defendant Pasco County Professional Firefighters, Local 4420, IAFF's Motion to Dismiss Amended Complaint and Supporting Memorandum of Law (Dkt. #37) is **GRANTED IN PART**.

2.      Plaintiffs' Counts II, V, X, XIII are **DISMISSED** without prejudice, and they shall have 20 days to amend from the date of this Order. Plaintiffs' Counts XVI, XXI, XIX, and XXIV are **NOT DISMISSED**.

3.      Defendant Pasco County, Florida's Motion to Dismiss Counts I, III, IV, and VI of Plaintiff Anthony Booth's Amended Complaint and Memorandum of Law in Support (Dkt. #38) is **DENIED**.

4.      Plaintiffs' Counts I, III, IV, and VI are **NOT DISMISSED**.

5.    Defendant Pasco County, Florida's Motion to Dismiss Counts VII, VIII, XVIII, XXIII of Plaintiffs' Amended Complaint and Memorandum of Law in Support (#39) is **GRANTED** to the extent that Plaintiffs did not adequately allege an official County policy of discrimination, nor did they adequately allege that the County's employee training was inadequate.

6.    Plaintiffs' Counts VII, VIII, XVIII, and XXIII are **DISMISSED** without prejudice, and they shall have 20 days to amend from the date of this Order.

**DONE** and **ORDERED** in Tampa, Florida on July 13, 2010.

_____
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel/Parties of Record

S:\Odd\2009\09-cv-2621.mtd 37final.wpd