# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

**ANTHONY BOOTH, et al.,**

    **Plaintiffs,**

v.                                                                          Case No.  8:09-cv-2621-T-30TBM

**PASCO COUNTY, FLORIDA, et al.,**

    **Defendants.**

_____/

## ORDER

THIS CAUSE comes before the Court upon Defendant Pasco County's Fed. R. Civ. Proc. 50(b) motion for Judgment Notwithstanding the Verdict, Defendant International Association of Firefighters Local 4420 ("The Union" or "Local 4420")'s Motion for Judgment Notwithstanding the Verdict, and Plaintiffs' Responses. Both motions were made orally on Monday, January 30, 2012.[1] Upon reviewing Defendants' arguments, and Plaintiffs' responses, the Court concludes Defendant Pasco County's Motion should be granted and Defendant Local 4420's Motion should be denied.

### Background

Plaintiff Anthony Booth ("Booth") and Plaintiff Jerry Brown ("Brown") claim both Pasco County and The Union retaliated against them after they filed various charges of discrimination against Defendants in 2007 and 2008.

---

[1] Defendant Local 4420 also made a Motion for Judgment as a Matter of Law before the case was sent to the jury (Dkt. 268). All of the arguments made in that motion were renewed in Local 4420's Motion for Judgment Notwithstanding the Verdict.

Booth states that Pasco County retaliated against him by, among other things: (1) intimidating and retaliating against those individuals he identified as witnesses to his alleged discrimination; (2) downgrading his performance review in certain areas; (3) transferring him to an undesirable location that required an increased work load; (4) causing him to lose substantial overtime and swap opportunities due to a general poisoning of the work atmosphere against him; and (5) mandating that he take a fitness for duty examination on pain of termination. Brown contends that the County retaliated against him in similar ways.

After the Union refused to assist Plaintiffs in prosecuting their charges against the County, Booth and Brown both filed individual discrimination charges against the Union with the EEOC. A short time later, the Union distributed an "Update on Legal Issues" memorandum to firefighters through the County email distribution system. It was later posted in fire station halls, where Pasco County employees, including non-union employees, could read it. The memo, in relevant part, states:

> Local 4420 members Jerry Brown and Anthony Booth have filed a Charge claiming unspecified discrimination with the U.S. Equal Employment Opportunity Commission against the Union and the County. The Executive Board and our attorney feel it is a frivolous claim with no grounds for support and we are extremely confident in winning but will still have to defend the charges. This could be very costly and generate a legal bill of $10,000 or more. If it becomes too costly the Union may have to assess its member's additional fees to offset the cost. We will update you as it progresses.

Plaintiffs allege the legal updates memo was distributed by the Union in retaliation for their earlier EEOC complaints against the Union. They contend the memo, which stated that union members would likely have to pay more in dues in order to defend against

Plaintiffs' "frivolous" claims, was designed to provoke firefighters to retaliate against them for filing EEOC charges against the Union.

Indeed, according to Plaintiffs, shortly after the Union distributed the legal updates memo, their fellow union members and firefighters did proceed to retaliate against them, quickly turning them into social pariahs. Among other things, Plaintiffs contend that: (1) union members were no longer willing to swap shifts with them; (2) they were not picked for voluntary overtime; (3) they were not welcome at many of the stations to which they wished to transfer; (4) they were subjected to unfair discipline (5) they were subjected to profanity and threats;[2] (5) fellow union member's retaliatory conduct, instigated by the Union's memo led Plaintiffs to fear for their lives[3]; and (6) they were otherwise subjected to various harassing behavior

Plaintiffs contend, among other things, the fact that the Union: (1) included their names in the memo (where names on other legal matters were left off); (2) characterized their charges as frivolous; (3) stated that dues might have to be increased to pay for the Union's defense (where, at the time of the distribution of the memo it was at best highly speculative that dues would ever be increased), and; (4) disseminated the memo to non-union as well as union employees, all support the inference that the Union disseminated the memo not to

---

[2] For example, one fellow firefighter allegedly stated that "someone [needs] to shut [Brown's] F'ing mouth before [Union] dues go up." Another purportedly threatened to "beat [Brown's] ass" and attempted to fight him.

[3] Plaintiffs stated under oath that their fellow-firefighters, among other things, might deliberately fail to give Plaintiffs sufficient water pressure while they were fighting a fire.

inform their members of union business, but rather, to retaliate against Plaintiffs for filing EEOC charges against the Union.

The case went to trial on Plaintiffs' retaliation claims, and, after a six-day jury trial, the jury found for the Plaintiffs against both the County and the Union.

While Plaintiffs alleged that the County took several retaliatory actions against them, the jury only found one of these actions to be truly retaliatory. Specifically, the jury found that "forcing Plaintiff[s...] to sign a statement under threat of termination which resulted in a fitness for duty examination" was an adverse action taken in retaliation for Plaintiffs' filing grievance and EEOC charges against the County. The jury awarded each Plaintiff $500 in lost wages and benefits, $10,000 to compensate Plaintiff Booth for emotional pain and suffering, and $12,000 to compensate Plaintiff Brown for emotional pain and suffering.

The jury also found the Union retaliated against Plaintiffs for filing EEOC charges against the Union. Specifically, the jury found the Union retaliated against Plaintiffs by: "Naming Plaintiff[s...] in the legal update memo and editorializing about possible ramifications to union members." The jury awarded each Plaintiff $75,000 for emotional pain and suffering. And, as the jury found the Union acted with malice or reckless indifference with respect to Plaintiffs' federally protected rights, the jury also awarded each Plaintiff $8,000 in punitive damages.

Now, both Defendant Pasco County and Defendant Local 4420 move for judgment notwithstanding the verdict.

**Discussion**

Under Fed. R. Civ. P. 50(b), a Court may overturn a jury verdict only if: (1) the verdict is premised on incorrect legal standards, or; (2) "the facts and inferences point so overwhelmingly in favor of one party that reasonable people could not arrive at a contrary verdict." *Brown v. Alabama Dept. of Transp.,* 597 F.3d 1160, 1173 (11th Cir. 2010) (quoting *Combs v. Plantation Patterns,* 106 F.3d 1519, 1526 (11th Cir. 1997)). In deciding whether to overturn a verdict, the Court must view the evidence in a light most favorable to the party opposing the motion. *Id.* Moreover, the Court may not make credibility judgments, re-weigh the evidence, and/or substitute its own judgment for that of the jury. *Id.; Jackson v. State of Alabama State Tenure Com'n,* 405 F.3d 1276, 1281 (11th Cir. 2005). On the contrary, the Court's role is limited to deciding whether there is *some* evidence in support of the verdict such that a reasonable person could have supported it. *Brown,* 597 F.3d at 1160.

**A.   Pasco County's Motion for Judgment Notwithstanding the Verdict**

Defendant Pasco County argues that the jury's verdict is supported by insufficient evidence and thus must be overturned as a matter of law. Pasco County argues that: (1) referring Plaintiffs to a fitness for duty examination was not an adverse action as a matter of law; (2) Plaintiffs failed to make out a prima facie case of retaliation by failing to show a causal connection between their protected activity and the County's alleged adverse actions; and (3) Plaintiffs failed to rebut Pasco County's proffered legitimate non-retaliatory reasons for its actions, to wit, that it ordered the fitness for duty evaluations for safety reasons.

"A *prima facie* case of retaliation under Title VII requires the plaintiff to show: (1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." *Crawford v. Carroll,* 529 F.3d 961, 970 (11th Cir. 2008); *Butler v. Alabama Dep't of Transp.,* 536 F.3d 1209, 1212-13 (11th Cir. 2008) ("To establish a claim of retaliation under Title VII or section 1981, a plaintiff must prove that he engaged in statutorily protected activity, he suffered a materially adverse action, and there was some causal relation between the two events.").[4] Plaintiff's burden of establishing a *prima facie* case is not heavy. *See Crapp v. City of Miami Beach,* 242 F.3d 1017, 1020 (11th Cir. 2001) (the prima facie case requirement is not an onerous one).

Importantly, the *McDonnell Douglas* burden-shifting framework applies to Title VII retaliation claims relying on circumstantial evidence. *Brown v. Alabama Dept. Of Transp.,* 597 F.3d 1160, 1181 (11th Cir. 2010). Once a plaintiff has made a *prima facie* case of retaliation, "the burden of production shifts to the defendant to rebut the presumption by articulating a legitimate, non-discriminatory reason for the adverse employment action." *Id.* If the defendant is able to successfully rebut the presumption of retaliation, then the burden shifts back to the plaintiff to show that the defendant's purported reasons are a mere pretext for retaliation. *Id.* at 1181-82.

---

[4] The same standard also applies to retaliation claims under the Florida Civil Rights Act. *Blizzard v. Appliance Direct, Inc.,* 16 So.3d 922, 926 (Fla. 5th DCA 2009).

Here, even assuming that Plaintiffs met their burden of proving a prima facie case of retaliation, it is nonetheless clear that Pasco County offered evidence that it referred Plaintiffs to fitness for duty examinations for a legitimate, non-retaliatory reason (namely, safety). Moreover, Plaintiffs failed to successfully rebut this non-retaliatory reason. Indeed, the Court concludes that Plaintiffs failed to offer even *some* evidence such that a reasonable person could find that the alleged adverse action was in reality taken in retaliation for Plaintiffs' protected activity. As a result, the Court concludes that it is appropriate to overturn the jury's verdict against Pasco County.

As discussed above, the jury found that Pasco County ordered Plaintiffs to take fitness for duty evaluations in retaliation for Plaintiffs engaging in protected activity, namely, filing grievance and EEOC charges against the County.[5] This was the only adverse action found by the jury.

According to Pasco County, it only contemplated sending Plaintiffs to fitness for duty examinations after becoming apprised of information contained in Plaintiffs' July 27, 2011 affidavits, which were filed in support of Plaintiffs' opposition to Defendant Local 4420's Motion for Summary Judgment. In his affidavit Booth stated, among other things, that:

> As a result of the legal updates memo distributed by Local 4420, there is the potential that I may be subjected to danger in my job...[w]ith a lack of cooperation and trust from my fellow co-workers and union members, I could die....If I am advancing into a structure and my co-worker only gives me half of the water pressure I need, I could be over run by the fire...If a co-worker allowed my hose line to lose water pressure and then suddenly increased the

---

[5] Booth and Brown were also made to sign a form stating that their continued employment was conditioned on their completing a fitness for duty examination.

pressure, this could cause a surge and my body could be blown backwards, causing injury to myself and others...I am also uncomfortable depending on co-workers who I cannot trust to be willing to save my life if I were trapped in a structure or under a collapsed roof. I do not think they would put their life on the line for someone who they are "pissed off" at because I made legitimate complaints against the union.

Similarly, Plaintiff Brown stated, among other things, that:

As a result of the legal updates memo distributed by Union Local 4420...I am forced to work in an untrustworthy environment. I have no choice but to rely on my co-workers for my safety, well-being, or my life. I feel the potential of intentionally being subjected to dangerous situations in my job, since I clearly no longer have the respect and trust of my co-workers...If my co-workers are not responsible with equipment, out of spite, and I need that equipment later in the shift, me and the whole crew may be put in a precarious, potentially life-threatening position...Due to their obvious anger at me for bringing legitimate complaints against the Union and Pasco County, I do not feel, at this point, I can count on most co-workers to assist me during fire fighting, or to back me up in dangerous, life threatening situations.

At trial, Defendant Pasco County argued these affidavits raised serious concerns with respect to the safety of the Plaintiffs, their co-workers, and the public. In effect, Plaintiffs were saying, under oath, that they were so vilified that they, and co-workers working alongside of them, were in danger of imminent bodily harm. The Pasco County Fire Chief explained the necessity of evaluating Plaintiffs' statements in the context of how a crew actually responds to a fire. For example, in reality, not one, but several, firemen carry a fire hose into a burning building, both because it is heavy and because tremendous pressure is exerted when water is forced through it. So if a fireman on the truck were to shut off the water or increase the pressure suddenly, it would injure not just Booth or Brown, but also the other firemen holding the hose.

Because a safe and successful operation necessitates the cooperation of the entire team, the failure of some firefighters to properly support others could result in serious consequences, and potentially injure Plaintiffs, their co-workers, and/or the public. Thus, if Plaintiffs' stated fears were well-founded, they raised serious safety concerns for Pasco County.

If Plaintiffs' fears were unfounded, evidencing paranoia on the part of Plaintiffs, this too could impact the safety of Plaintiffs and co-workers. Either way the County had to deal with a serious safety issue. Accordingly, the County referred Plaintiffs for fitness for duty examinations to determine if Plaintiffs were "fit to protect the public in responding to emergencies...[and to]...determine what, if any, actions were needed either in terms of group relations, peer mediations, counseling, or other actions, including possible removal of Mr. Booth and Mr. Brown from emergency services response functions." (Declaration of Jane M. Calano, Dkt. 153, at 4. Ms. Calano also confirmed this statement at trial.).

Had the County failed to refer Plaintiffs for assessment, it may very well have been considered negligent if someone were subsequently injured. It is important to remember that, in a paramilitary organization such as a fire department, fitness for duty is of paramount importance; consequently, all doubts with respect to a team member's ability to competently and safely serve the public are taken quite seriously.

That the County referred Plaintiffs to fitness for duty examinations for legitimate, non-retaliatory reasons was also bolstered by the undisputed evidence at trial which showed that: (1) the exams were only ordered after Pasco County became aware of the safety concerns

raised in Plaintiffs' affidavits (Plaintiffs were never before ordered to undergo a fitness for duty exam); (2) Pasco County's standard operating procedure was to refer individuals potentially posing a danger to themselves and/or others to take a fitness for duty examination; (3) Pasco County had referred seventeen others for fitness for duty exams in the past four years;[6] (4) none of the individuals named in Booth and Brown's complaints of discrimination against the County made the decision to order the fitness for duty exams; (5) the decision to refer was made by Jane Calano, Risk Manager for Pasco County, an individual in no way involved with the prior discriminatory conduct alleged by Plaintiffs; (6) before making the decision, Ms. Calano sought the advice of an independent consultant based in Chicago, a non-Pasco County employee, in order to ensure that the referral decision was merited; and (7) the exams were ordered approximately three years after Plaintiffs filed their various charges of discrimination against the County.

Finally, Plaintiffs offered virtually no evidence contradicting Pasco County's contention that the fitness for duty examinations were ordered for safety reasons. No expert testified that the recommendation of the outside consultant should not have been followed. In fact, there was no testimony from any witness concerning what factors should, or should not, be considered in deciding when a fitness for duty examination is necessary.

The Court concludes there is insufficient evidence such that a reasonable person could conclude that the fitness for duty examinations were ordered for retaliatory purposes.

---

[6] Employees were referred for, among other things, anger-management problems, alcohol and substance abuse, domestic violence issues, and disturbing drawings.

Consequently, it is appropriate to overturn the jury verdict against Pasco County, as the County's ordering Plaintiffs to submit to fitness for duty exams were the *only* adverse actions found by the jury.

### B. Local 4420's Motion for Judgment Notwithstanding the Verdict

The jury found that after Booth and Brown filed EEOC charges against Local 4420, Local 4420 retaliated against Plaintiffs by disseminating a legal updates memo to Pasco County employees (including non-union employees). The legal updates memo, which stated that union dues might have to be increased in order to fight the "frivolous" charges filed by Booth and Brown, was also found by the jury to have been disseminated with malice, and/or with reckless indifference with respect to Plaintiffs' federally protected rights.[7]

Local 4420 contends the legal updates memo was not retaliatory but merely intended to inform its members of the pending EEOC charges against it, of the Union's evaluation of the suit (as frivolous), and of possible costs which might be associated with defending the charges. Local 4420 further argues it has a First Amendment privilege to inform its members of Union legal business, and to speak out publicly to defend itself against charges of discrimination.

As the Union contends the legal updates memo was protected speech, it argues that the distribution of the memo cannot serve as a predicate retaliatory act. Moreover, as the

---

[7]As the First Circuit recently remarked "[c]ourts have often deemed acts by employers and unions that involved speech to be discriminatory or retaliatory. *See, e.g., Eliserio v. United Steelworkers, Local-310,* 398 F.3d 1071, 1077 (8th Cir. 2005) (dissemination of 'No Rat' stickers by union official found discriminatory); *Hashimoto v. Dalton,* 118 F.3d 671, 674 (9th Cir. 1997) (dissemination of unfavorable job reference found retaliatory); *Paxton v. Union Nat'l Bank,* 688 F.2d 552, 572 (8th Cir. 1982) (intensive interrogation of employee over filing EEOC charge found retaliatory)." *Dixon v. International Brotherhood of Police Officers,* 504 F.3d 73, 83 (1st Cir. 2007).

dissemination of the memo was the only adverse action found by the jury, the Union argues the Court must overturn the jury's verdict against the Union and grant the Union's motion for judgment notwithstanding the verdict. The Union's motion thus turns, in large part, on the question of whether the Union's legal updates memo was speech protected by the First Amendment.[8]

While the United States Supreme Court appears to have never explicitly decided the issue of whether Title VII liability for verbal acts may sometimes run afoul of the First Amendment, it has touched upon the question in passing. For example, in *R.A.V. v. St. Paul,* 505 U.S. 377, 389 (1992) the Supreme Court stated in dicta that:

> since words can in some circumstances violate laws directed not against speech but against conduct (a law against treason, for example, is violated by telling the enemy the Nation's defense secrets)...speech can be swept up incidentally within the reach of a statute directed at conduct rather than speech. [Citations.] Thus, for example, sexually derogatory 'fighting words,' among other words, may produce a violation of Title VII's general prohibition against sexual discrimination in employment practices." *Id.* at 389.

Moreover, in *Wisconsin v. Mitchell,* 508 U.S. 476, 487 (1993), the Supreme Court remarked that "[i]n *Hishon* [*v King & Spalding,* 467 U.S. 69 (1984)], we rejected the argument that Title VII infringed employers First Amendment rights[, a]nd more recently,

---

[8]The Court rejects Local 4420's other arguments for judgment notwithstanding the verdict, including its argument that Plaintiffs failed to rebut the Union's proffered legitimate, non-retaliatory reason for its actions, (i.e., to inform Union members of Union business). Among other things, the fact that the memo was distributed very shortly after Plaintiffs filed EEOC charges against the Union, that the Union gave conflicting reasons for disseminating the memo, that it included Plaintiffs' names (where it did not include names with respect to other legal matters), that it characterized Plaintiffs' charges as frivolous, that it included the highly speculative assertion that dues might have to be increased, and that it disseminated the memo to non-union employees all may support the jury's finding that the memo in reality was disseminated for retaliatory purposes. The Court also rejects the Union's arguments that its motion should be granted on the supposed availability of various affirmative defenses

in *R.A.V.*...we cited Title VII...as an example of a permissible content-neutral regulation of conduct."

Several courts have interpreted the Supreme Court's dicta in *R.A.V.* and *Mitchell* (as well as dicta in other cases) to indicate that Title VII, in general, poses no First Amendment constitutional problems, even if it seeks to prohibit speech. *See, e.g., Baty v. Williamette Industries, Inc.,* 172 F.3d 1232, 1246-47 (10th Cir. 1999), *overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101 (2002) (in holding that various sexually harassing comments were not protected by the First Amendment, the court stated "[w]e note that the Supreme Court has strongly suggested that Title VII, in general, does not contravene the First Amendment."); *Jenson v. Eveleth Taconite Co.,* 824 F.Supp. 847, 884, n. 89 (D. Minn. 1993) ("Title VII [] is concerned with regulating the work place, not society generally. As a result, acts of expression which may not be proscribed if they occur outside of the workplace may be prohibited if they occur at work....Title VII may legitimately proscribe conduct, including undirected expressions of gender intolerance, which create an offensive working environment. That expression is "swept up" in this proscription does not violate First Amendment principles."); *Scandinavian Health Spa, Inc. v. Ohio Civil Rights Comm.,* 64 Ohio App.3d 480, 492-93 (Ohio Ct. App. 1990) ("just as 'racial epithets' may be actionable under Title VII, sexual abuse, be it verbal or otherwise, which creates a hostile or offensive work environment, is likewise actionable and does not constitute protected speech..."); *Aguilar v. Avis,* 21 Cal. 4th 121, 135 (Cal. 1999) ("we conclude that it is clear

from the high court's decisions...that the First Amendment permits imposition of civil liability for past instances of pure speech that create a hostile work environment.").[9]

If these courts are correct in their contention that Title VII liability for verbal acts fails to present constitutional problems, then, of course, the Union's legal updates memo does not qualify as protected speech. Other courts, however, have been skeptical of the claim that the Supreme Court's dicta in *R.A.V.* (and other cases) shows Title VII to be insulated from First Amendment defenses. Consider, for example, *Rodriguez v. Maricopa County Community College District,* 605 F.3d 703 (9th Cir. 2010).[10] In that case a professor sent three racially charged emails over a university-wide email distribution system asserting the superiority of Europeans and Christians over Native Americans and others. *Id.* at 705-06. The court, upon concluding that there was no categorical harassment exception to the First Amendment, stated that the speech was protected. *Id.* at 708, 710.

The court noted that the Professor's emails:

> were pure speech; they were the effective equivalent of standing on a soap box in a campus quadrangle and speaking to all within earshot. Their offensive

---

[9] Other Courts have held that speech in violation of Title VII constitutes *discriminatory conduct*, and thus can be proscribed without implicating constitutional concerns. *See, e.g., Robinson v. Jacksonville Shipyards, Inc.,* 760 F.Supp. 1486, 1535 (M.D. Fla. 1991) (In holding that sexually harassing behavior including verbal remarks constituted discriminatory conduct, not protected speech, our sister court quoted with approval the Supreme Court's statement in *Roberts v. United States Jaycees,* 468 U.S. 609, 628 (1984) that "potentially expressive activities that produce special harms distinct from their communicative impact...are entitled to no constitutional protection."). The *Robinson* court went on to note that "[i]n this respect, [sexually harassing speech] is indistinguishable from the speech that comprises a crime, such as threats of violence or blackmail, of which there can be no doubt of the authority of a state to punish." *Robinson,* 760 F.Supp. at 1535. The *Robinson* court also suggested that Title VII could survive a strict scrutiny challenge as the government's interest in eradicating workplace discrimination was a compelling interest, and Title VII was narrowly tailored to accomplish these goals. *Id.* at 1536.

[10] *See also, DeAngelis v. El Paso Municipal Police Officers Association,* 51 F.3d 591 (5th Cir.1995) (noting that punishing speech in violation of Title VII raises real constitutional concerns, the court, in dicta, stated that "the Supreme Court's offhand pronouncements [on the subject are] unilluminating.").

> quality was based entirely on their meaning, and *not on any conduct or implicit threat of conduct that they contained. Id.* at 710 (emphasis added).

The court stated that to punish the Professor's speech in this situation would be to prohibit speech merely because of its offensive viewpoint, an axiomatic violation of the First Amendment that would arbitrarily restrict the marketplace of ideas.[11] *Id.* at 708.

Notably, *Rodriguez,* as well as other cases finding a potential conflict between Title VII and the First Amendment, have been particularly concerned with Title VII silencing speech based on its particular viewpoint. *See, e.g., id.* at 708-10; *DeAngelis,* 51 F.3d at 596-97.

Judicial reticence in punishing such speech is understandable since it is a foundational principle of First Amendment jurisprudence that speech cannot be punished merely because it is offensive or disagreeable. *See, e.g., Synder v. Phelps,* 131 S.Ct. 1207, 1219 (2011); *Texas v. Johnson,* 491 U.S. 397, 414 (1989). Indeed, having repeatedly praised the need to ensure a free and open marketplace of ideas, the Supreme Court has long looked down on regulations prohibiting speech in order to silence a particular point of view. *See, e.g., id.* As a result, some courts have been understandably concerned when Title VII silences speech based upon its particular point of view.

Here, however, the concern of Title VII facilitating viewpoint suppression is not present. The problematic quality of the Union's legal updates memo is not that it displayed

---

[11]The *Rodriguez* court conceded that "racial insults or sexual advances directed at particular individuals in the workplace may be prohibited on the basis of their non-expressive qualities....as they do not 'seek to disseminate a message to the general public, but to intrude upon the targeted [listener], and to do so in an especially offensive way.'" (quoting *Frisby v. Shultz,* 487 U.S. 474, 486 (1988)).

an unpopular point of view, expressed "offensive" or "disagreeable" thoughts or contributed the "wrong" produce to the "marketplace of ideas." Nor is the problem with the memo the "communicative impact" that it had on the Plaintiffs.

Plaintiffs' essential complaint is not that the memo offended them in some way, or that they vigorously disagreed with it. On the contrary, the crux of Plaintiffs' case is that the memo constituted a call for reprisal; specifically, that it was intended to (and did) spur others, namely union members, to take concrete, discriminatory actions towards them in order to punish them for filing charges of discrimination.

When Title VII seeks to prohibit workplace speech not based upon its point of view, but instead because the speech constitutes an implicit call for reprisal, and/or a threat, that speech is not protected by the First Amendment.[12] For example, consider the case of *Dixon v. International Brotherhood of Police Officers,* 504 F.3d 73 (1st Cir. 2007). In *Dixon,* after a female police officer filed an EEOC charge against her union, the union president proceeded to make various impugning statements against the officer on his television show. *Id.* at 80, 83-84. In finding that the comments made by the union president could support a retaliation verdict, the court stated:

---

[12]Implicit threats by an employer in the workplace setting have long been held to constitute unprotected speech. *See, e.g., NLRB v. Gissel,* 395 U.S. 575, 585, 618 (1969) (employer's statement to employees that in the event of unionization the plant could shut down constituted an implied threat that the employer may retaliate against his employees for exercising their right to join a union; hence, it was held not to be protected speech); *NLRB v. Aerovox Corp.,* 435 F.2d 1208, 1211-12 (4th Cir. 1970) (implicit employer threats not protected by First Amendment); *Frito-Lay, Inc. v. NLRB,* 585 F.2d 62, 66 (3rd Cir. 1978) (same); *NLRB v. Roselyn Bakeries, Inc.,* 471 F.2d 165, 167 (7th Cir. 1972) (an employer's "communications must not contain a threat of coercion or reprisal, express or implied"); *Rodriguez,* 605 F.3d at 710 (9th Cir. 2010) (noting that implicit employer threats are not protected and that "[i]n the context of a supervisory relationship, advocacy of discriminatory ideas can connote an implicit threat of discriminatory treatment and *could* therefore amount to intentional discrimination," in which case such statements would not be protected by the First Amendment).

>In outlawing retaliation, Congress and the Massachusetts legislature prohibited a type of conduct that can, and often does, include speech. '[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.' (Citing *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978), quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)). *Id.* at 83.

Although the court found retaliatory speech could be prohibited, it did note there are limits to what speech can be properly punished as retaliatory; for example, it stated that the person publicly accused of discrimination or retaliation should be able to defend themselves.[13] *Id.* at 84. However, the court stressed that the fact that an individual files a charge of discrimination against an employer or union should not provide a safe harbor enabling that party to respond with "any and all sort of speech in response." *Id.* Indeed, it noted "[t]here is an important difference between defending oneself, on the one hand, and threatening, intimidating, or otherwise interfering with someone's right to pursue a discrimination claim on the other." *Id.* As a result, the *Dixon* court held the union president's retaliatory speech was not protected by the First Amendment. *Id.*

Here, as discussed in detail above, the problem with the Union's speech was it had the potential of being seen (and was seen by the jury) as an implicit call for reprisal. As such, it is not protected by the First Amendment.

Although this Court ultimately concludes that the Union's speech is not protected, it does not take the Union's arguments lightly. The Union has a duty to keep its members

---

[13]*See, e.g., Bain v. City of Springfield,* 424 Mass. 758, 766 (Mass. 1997) ("What we most emphatically cannot countenance as an instance of retaliation is the mayor's response in the local newspaper to the charges against him.").

informed, and it has a strong argument that all information in the memo was information that its members were entitled to know. Indeed, had this information been given in answers to questions in a Union meeting, it would pose a closer question.

Nonetheless, the jury found that the legal updates memo was not disseminated in an effort to inform Union members about Union business, but instead served as an implicit call for reprisal, thus constituting a retaliatory act. As the Court concludes that sufficient evidence was presented at trial such that a reasonable person could interpret the dissemination of the memo to be retaliatory in this way, the Court concludes the Union's speech was not protected by the First Amendment. As a result, it is not appropriate to overturn the jury verdict against the Union.

It is therefore **ORDERED AND ADJUDGED** that:

1. Defendant Pasco County's Oral Motion for Judgment Notwithstanding the Verdict is hereby granted.

2. The jury verdicts against Defendant Pasco County (Dkts. 276 & 278) are hereby VACATED.

3. The Clerk is directed to enter final judgment in favor of Pasco County and against Plaintiffs Anthony Booth and Jerry Brown.

4. Defendant International Association of Firefighters Local 4420's Motion for Judgment as a Matter of Law (Dkt. 268) is hereby denied.

5. Defendant International Association of Firefighters Local 4420's Oral Motion for Judgment Notwithstanding the Verdict is hereby denied.

6. The Clerk is directed to enter judgment in favor of Plaintiff Anthony Booth and against Defendant International Association of Firefighters Local 4420 in the total amount of $83,000.

7. The Clerk is directed to enter judgment in favor of Plaintiff Jerry Brown and against Defendant International Association of Firefighters Local 4420 in the total amount of $83,000.

8. The Clerk is directed to deny any other pending motions as moot, and close this case.

**DONE** and **ORDERED** in Tampa, Florida on February 21, 2012.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel/Parties of Record

S:\Odd\2009\09-cv-2621.mjnv.wpd